Cora Lee Phillippi, Phyllis Catz, Cheryl Schlosser, Charles Knipe, et al. *v.* School District of Springfield Township. Cora Lee Phillippi, et al., Appellants.

Argued October 7, 1976, before President Judge Bowman and Judges Crumlish, Jr. and Wilkinson, Jr., sitting as a panel of three.

*Richard W. Rogers,* with him *Rogers, King & Cole,* for appellants.

*Charles Potash,* with him, of counsel, *Wisler, Pearlstine, Talone, Craig & Garrity,* for appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, January 14, 1977:

By resolutions adopted on April 21, 1975, and May 22, 1975, the Board of School Directors (Board) of the School District of Springfield Township, Montgomery County, provided for a reduction in the teaching staff after the conclusion of the 1974-1975 school year, due to a substantial decrease in pupil enrollment. Pursuant to these resolutions, six tenured professional employes, three of whom were employed part time, were suspended pursuant to Sections 1124 and 1125 of the Public School Code of 1949 (Code)[1] and the contracts of fourteen temporary professional employes were not renewed.

At the request of the affected employes, the Board conducted a hearing on May 29, 1975, and thereafter issued an adjudication upholding the reduction in staff. Ten of the employes then appealed to the

---

[1] Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§11-1124, 11-1125. Section 1124 provides, in pertinent part:

Any board of school directors may suspend the necessary number of professional employes, for any of the causes hereinafter enumerated:

(1) Substantial decrease in pupil enrollment in the school district;

. . . .

Montgomery County Court of Common Pleas pursuant to Section 7 of the Local Agency Law, Act of December 2, 1968, P.L. 1133, 53 P.S. §11307.[2] Since no record of the hearing before the Board was made, the court below elected to conduct a hearing de novo pursuant to Section 8 of the Local Agency Law, 53 P.S. §11308.[3]

Nine of the ten appellants below have now appealed to this Court. Of these nine, one is a full-time tenured professional employe, two are part-time tenured professional employes and six are temporary professional employes.[4]

Appellants' arguments focus into two major issues: (1) was there a substantial decrease in pupil enrollment sufficient to justify the suspensions and

[2] As we indicated in *Smith v. Board of School Directors of The Harmony Area School District*, 16 Pa. Commonwealth Ct. 175, 328 A.2d 883 (1974), this was the proper appeal procedure inasmuch as temporary professional employes have no appeal rights under the Code and the appeal procedure provided for tenured professional employes at Section 1127 et seq. of the Code, 24 P.S. §§11-1127 et seq., is only applicable to dismissals and not to suspensions.

[3] On this point, appellants contend that a stenographic record of the proceedings before the Board is a prerequisite to a valid adjudication pursuant to Section 4 of the Local Agency Law, 53 P.S. §11304. This contention is without merit inasmuch as Section 4 clearly provides that a full and complete stenograhic record "may" be kept and that if such record is not provided by the local agency, it may be kept by any party agreeing to pay the costs thereof. Appellants do not contend that they ever requested that a stenographic record be made or that they agreed to pay for same.

[4] The appellants are Cora Lee Phillippi and Phyllis Catz, tenured part-time employes, Bonnie M. Cohen, a tenured full-time employe, and Cheryl Schlosser, Charles Knipe, Barry Goldstein, Muriel W. Edgerton, Maria Kotch and Paula Jane Schwartz, all temporary professional employes. Joan R. Holmes, who was an appellant below, was apparently reinstated and withdrew from the case at the lower court level. Winifred Carlson-Swartz is alleged, in the brief, to be an appellant here, but cannot be inasmuch as she was not a party below.

terminations involved? and (2) if so, was the manner of selecting those employes to be suspended or terminated proper and in accordance with the Code? We note that our scope of review is limited by Section 8 of the Local Agency Law and we must affirm the Board and the court below unless we find a violation of constitutional rights, an error of law or manifest abuse of discretion, or that a necessary finding of fact is not supported by substantial evidence. *Gabriel v. Trinity Area School District*, 22 Pa. Commonwealth Ct. 620, 350 A.2d 203 (1976).

Appellants first argue that there was insufficient competent evidence to determine whether a decrease in enrollment had occurred and that if such decrease did occur, it was not "substantial" enough to justify the suspensions and terminations in question. Specifically, appellants object that some of the enrollment records admitted were not signed, that some were in pencil or ink rather than typewritten, and that there was insufficient evidence as to a custodian of the records or the regularity of their entry.

We have carefully reviewed the testimony of the superintendent of the school district with regard to the records of enrollment and how they were compiled. We agree with the court below that while these records left something to be desired, they did qualify as business records and did establish a decrease in enrollment.[5]

---

[5] The superintendent testified to the following figures which were included in the Board's resolution of April 21, 1975:

| | Enrollment | |
| --- | --- | --- |
| *School Year* | *Elementary* | *Secondary* |
| 1969-70 | 1,976 | 2,163 |
| 1970-71 | 1,860 | 2,222 |
| 1971-72 | 1,818 | 2,324 |
| 1972-73 | 1,714 | 2,331 |
| 1973-74 | 1,617 | 2,282 |
| 1974-75 | 1,520 | 2,133 |
| 1975-76 (projected) | 1,439 | 2,039 |

With respect to whether this decrease was "substantial" within the meaning of Section 1124 of the Code, we note that there is not and cannot be a precise definition of what is a "substantial" decrease sufficient to justify a given number of job eliminations. This is an area in which school boards must exercise discretion and board action will not be disturbed absent a showing that such discretion was abused, or that the action was arbitrary, based on a misconception of law or ignorance of facts. *Board of School Directors of the School District of Scranton v. Roberts*, 13 Pa. Commonwealth Ct. 464, 320 A.2d 141 (1974); *Smith v. Board of School Directors of The Harmony Area School District* (hereinafter *Harmony*), 16 Pa. Commonwealth Ct. 175, 328 A.2d 883 (1974). Just as we found a decrease of 114 students over a ten year period to be "substantial" enough to justify the suspensions in *Harmony, supra,* we find that a decrease of 486 students over a five year period (or 661 students over a six year period, if the 1975-76 projections are considered) is "substantial" under any definition of the term and is sufficient to justify the action taken in this case.[6]

On this same issue, appellants make an additional argument with specific reference to the nonrenewal of the contract of appellant Edgerton, a school nurse. Appellants contend that the Superintendent, in determining that her services were no longer required because of decrease in enrollment, did not take into account the fact that the school district provides nursing services to private and parochial schools in the area as well as to its own students. The Board responds that Section 1402(a.1) of the Code, 24 P.S. §14-

---

[6] Perhaps more significant is the fact that in the secondary schools, where most of the suspensions and terminations took place, enrollment has declined by approximately 300 students in the last three years.

1402(a.1), only requires that the number of pupils under the care of each school nurse not exceed 1500 and that, in this case, the pupils, including private and parochial students, assigned to each of the five nurses remaining after Nurse Edgerton was terminated, did not exceed that figure. While we agree with appellants that Section 1402(a.1) does not mandate that there be *no more* than one nurse for each 1500 students, we reiterate that this is an area in which the Board must exercise discretion. Under these facts, we can find no error of law or abuse of discretion in the decision not to renew Nurse Edgerton's contract.

The more difficult issue in this case is whether the Board properly determined which teachers were to be suspended or terminated. This requires a rather extensive review of the record and a careful analysis of the relevant provisions of the Code.

Section 1125 of the Code, 24 P.S. §11-1125, outlines the procedure for suspending professional employes when a decrease in staff is necessary:

(a) Whenever a board of school directors decreases the size of the staff of professional employes, the suspensions to be made shall be determined by the the [sic] district superintendent on the basis of efficiency rank determined by ratings made in accordance with standards and regulations, determined by rating cards prepared by the Department of Public Instruction, as required by section one thousand one hundred twenty-three of this act. It shall be the duty of boards of school directors to cause to be established a permanent record system, containing ratings for each professional employe employed within the district. . . .

(b) In cases in which suspensions are to be made, professional employes shall be retained on the basis of seniority rights, acquired within

the school district of current employment, where no differences in rating are found. Seniority rights shall also prevail where there is no substantial difference in rating. In cases where there are substantial differences in rating of those under consideration for suspension, seniority shall be given consideration in accordance with principles and standards of weighting incorporated in the rating cards. . . .

(c) No suspended employe shall be prevented from engaging in other occupation during the period of such suspension. Suspended professional employes shall be reinstated in the inverse order of their suspension. No new appointment shall be made while there are suspended professional employes available, who are properly certified to fill such vacancies. (Footnote omitted.)

The court below found, the record supports and the appellants do not dispute that the procedure used and the factors considered by the superintendent (and approved by the Board) to determine which teachers would be suspended or terminated was essentially as follows. First, the superintendent determined the subject areas in which the most significant declines in enrollment had occurred.[7] He then identified the employes teaching these subjects and established three separate seniority lists for (1) full-time tenured professional employes, (2) part-time tenured professional employes and (3) temporary professional employes. The superintendent and the Board took the position that neither the temporary professional employes nor the part-time professional employes, although the latter were tenured, were "professional employes" with-

---

[7] All of the present appellants, except Maria Kotch, taught in the secondary schools and were certified in one or more specific subject areas.

in the meaning of Section 1125 and thus were not entitled to its protection. Nevertheless, as a matter of fairness, the Board resolved to treat the temporary professional employes, whose contracts were not renewed, "as if suspended," thus gratuitously applying the criteria of Section 1125(a) and (b) to them and according them reinstatement rights as provided in Section 1125(c). The Board did *not* similarly designate the part-time employes "as if suspended" but rather did, in fact, simply "suspend" them along with the full-time tenured professional employes, presumably pursuant to Section 1125, despite the previous determination that they (the part-time employes) were not entitled to such treatment. Thus while the part-time employes were suspended in the order of their seniority *within* the class of part-time employes, their seniority was not compared with that of full-time tenured employes. It should also be noted that, with respect to the tenured professional employes (both full and part-time), no efficiency ratings existed within the meaning of Section 1125(a). The Board therefore decided to treat them as though "no substantial differences in rating" existed, and thus made the suspensions based entirely on seniority pursuant to Section 1125 (b). Finally, the superintendent considered "realigning" the staff so as to retain the teachers with the greatest seniority as required by *Welsko v. Foster Township School District*, 383 Pa. 390, 393, 119 A.2d 43, 44 (1956), but was unable to implement such a plan.

Based on these considerations and determinations, the superintendent recommended that the most junior employes in each affected subject area be suspended or terminated depending upon whether they were tenured professional employes (full and part-time) or temporary professional employes. In all cases the part-time employes, although tenured, were consid-

ered junior to temporary professional employes and the temporaries, in turn, were junior to the full-time tenured employes.

Appellants attack the procedure described above on a number of grounds as not in compliance with Section 1125. We shall first consider those arguments advanced primarily on behalf of the temporary professional employes. In this regard, appellants contend: (1) that the term "professional employe" in Sections 1124 and 1125 *includes* "temporary professional employes" and that such temporary professional employes are thus entitled to be suspended thereunder rather than having their contracts terminated; (2) that Section 1125 requires that in determining suspensions, efficiency ratings should first be applied across the board to *all* teachers, whether tenured or not, and to all subject areas, regardless of where declines in enrollment have occurred, and that seniority rights should only come into play where no differences in rating as to *all* such teachers are found; and (3) that since no efficiency ratings existed for the tenured employes, the superintendent's inability to compare ratings as between tenured and temporary employes renders all the suspensions and terminations invalid. We reject all of these contentions for the reasons that follow.

First, we disagree with the contention that temporary professional employes are "professional employes" within the meaning of Sections 1124 and 1125 of the Code. Section 1101 of the Code, 24 P.S. §11-1101, provides the following distinct definitions:

As used in this article,

(1) The term 'professional employe' shall include those who are certificated as teachers, supervisors, supervising principals, principals, assistant principals, vice-principals, directors of vocational education, dental hygienists, visit-

ing teachers, home and school visitors, school counselors, child nutrition program specialists, school librarians, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists and school nurses.

. . . .

(3) The term 'temporary professional employe' shall mean any individual who has been employed to perform, for a limited time, the duties of a newly created position or of a regular professional employe whose services have been terminated by death, resignation, suspension or removal.

Although it is not clear from these definitions, it is clear from a thorough reading of Article XI of the Code, and particularly Section 1108, 24 P.S. §11-1108, that the key feature distinguishing temporary professional employes from professional employes is tenure. *See George v. Department of Education,* 15 Pa. Commonwealth Ct. 239, 325 A.2d 819 (1974). Section 1108 (d) of the Code expressly provides:

(d) Temporary professional employes shall for all purposes, *except tenure status,* be viewed in law as full-time employes, and shall enjoy all the rights and privileges of regular full-time employes. (Emphasis added.)

Section 1108(b) further provides the manner in which a temporary professional employe becomes a "professional employe," *i.e.,* obtains tenure:

(b) A temporary professional employe whose work has been certified by the district superintendent to the secretary of the school district, *during the last four (4) months of the second year of such service, as being satisfactory shall thereafter be a 'professional employe' within the meaning of this article.* The attainment of this status shall be recorded in

the records of the board and written notification thereof shall be sent also to the employe. The employe shall then be tendered forthwith a regular contract of employment as provided for professional employes. . . . (Emphasis added.)

Absent the two distinct definitions in Section 1101 and the concept of tenure in Section 1108, it would be possible to argue that the term "professional employe" in Sections 1124 and 1125 is ambiguous or that it includes temporary professional employes. However, those sections foreclose such an argument as does the fact that when the Legislature intended that particular provisions of Article XI apply to both (tenured) professional employes and (nontenured) temporary professional employes, it so stated, or used the term "teacher." *See e.g.,* Sections 1106, 1109, 1111, 1112, 1123, 1141(1), 1144 and 1154 of the Code, 24 P.S. §§11-1106, 11-1109, 11-1111, 11-1112, 11-1123, 11-1141(1), 11-1144, and 11-1154. It did not do so with respect to Sections 1124 and 1125 and we must conclude that the term "professional employe" as used therein refers only to *tenured* professional employes and does not include temporary professional employes.[8] Consequently, temporary professional employes are not entitled to be suspended pursuant to Sections 1124 and 1125 and therefore have no rights of retention based either on efficiency rating or seniority as against tenured employes or as among themselves.[9] And while Sections 1124 and 1125 are

---

[8] *See Mazzei v. Scranton School District,* 341 Pa. 255, 19 A.2d 155 (1941) for a similar analysis of substantially the same provisions under the former Teachers Tenure Act.

[9] We are aware that *Harmony, supra,* involved an appeal by temporary professional employes who were, in fact, suspended pursuant to Sections 1124 and 1125 and who appealed on that basis. The issue of the *applicability* of those Sections to them was apparently never raised.

not, therefore, applicable to temporary professional employes, these Sections do, *by analogy,* provide a sound reason for the nonrenewal of their contracts. For if *tenured* employes may be *suspended* by reason of a substantial decrease in enrollment, it follows logically that the Board may refuse to renew the contracts of nontenured employes for the same reason.

We note that the conclusion reached here is merely a result of the whole scheme of Article XI of the Code in attributing tenure and its associated rights, including seniority, only after a two year trial period. The Board in resolving to treat the temporary professional employes "as if suspended" and thus granting them seniority and reinstatement rights as among themselves, did, in fact, extend them rights to which they were otherwise not entitled under the Code.

Our conclusion that temporary professional employes have no right to be retained on the basis of efficiency ratings or seniority as against tenured employes or among themselves, necessarily disposes of appellants' contention that efficiency ratings should first be applied to all teachers whether tenured or not. With respect to whether such ratings should be applied to all subject areas, regardless of where the most significant declines in enrollment have occurred, we previously rejected such a contention, by analogy, in *Harmony, supra*: "The law does not require a school district to retain unneeded teachers in one area of education at the expense of not hiring needed teachers in another area." 16 Pa. Commonwealth Ct. at 178, 328 A.2d at 885. Similarly, while we expressly do not approve of the Board's failure to maintain efficiency ratings on the tenured professional employes as required by Section 1125(a) of the Code, such failure cannot benefit the temporary professional employes who have no right to be retained or compared to the tenured employes on the basis of such ratings. As to

the tenured professional employes, we hold to the view expressed in *Harmony, supra,* at 180, 328 A.2d at 886, that the failure to maintain ratings does not invalidate the suspensions, at least where the suspended employes are the least senior.

Next, appellants argue that the superintendent failed to realign the teaching staff as required by *Welsko v. Foster Township School District,* 383 Pa. 390, 119 A.2d 43 (1956) ; *see also Harmony, supra.* The concept of realignment is explained in *Welsko, supra,* as follows :

> A school board has not done its duty simply because it retained no one with less continuous years teaching the subject which the suspended teacher was qualified to teach. Where a reduction in teaching staff is called for, the Board's first consideration should be how to retain those teachers with the longest years of service by realigning the staff so that the remaining teachers, after the reduction has been effected, can teach the subjects of those who, because of lesser seniority rights, have been suspended. 383 Pa. at 393, 119 A.2d at 44.

The superintendent testified that he examined the records of all teachers with certification in more than one subject area but was unable to effect a practical realignment. Appellants argue that in one instance, a tenured chemistry teacher could have been shifted to the position of guidance counselor, for which she was also certified, thus, after some additional shifting, enabling retention of a nontenured chemistry teacher. In view of our determination that nontenured teachers do not have seniority rights, we do not feel that the concept of realignment in *Welsko, supra,* which is a device for enforcing seniority rights, is applicable to a nontenured teacher. Even if it were,

however, the record clearly demonstrates that the proposed shift was totally impractical.

Appellants' final arguments are advanced on behalf of the tenured part-time professional employes. Here, appellants contend first, that there is no basis in the Code for distinguishing part-time employes and treating them as a separate class, and, second, that there was error in the way in which the seniority of the part-time employes was computed.

As indicated earlier, the part-time tenured employes were "suspended" presumably pursuant to Sections 1124 and 1125, although they were given seniority rights only among themselves and were considered junior to both temporary and tenured full-time professional employes. The Board attempts to justify so treating the part-time employes on the grounds that: (1) part-time employes, even if tenured, are not "professional employes" within the meaning of Sections 1124 and 1125 and are thus not entitled to seniority rights; and (2) part-time positions are year to year positions which, in this case, the Board decided to eliminate.

In support of its position that part-time employes, even if tenured, are not "professional employes" within the meaning of Sections 1124 and 1125, the Board first points to Section 1101 of the Code, 24 P.S. §11-1101, which provides in pertinent part: "As used in this article, (1) The term 'professional employe' shall include those who are certificated as teachers. . . ." The Board then refers to Section 1141 of the Code, 24 P.S. §11-1141, which provides, in pertinent part:

For the purposes of this subdivision [relating to compensation].—

(1) 'Teacher' shall include all professional employes and temporary professional employes, who devote fifty per centum (50%) of their time, or more, to teaching or other direct edu-

cational activities, such as class room teachers. . . . (Emphasis added.) (Footnote omitted.)
The Board argues that since the part-time employes who were suspended taught only 16.5 hours per week,[10] which is less than fifty per cent (50%) of a *normal work week*, they are not "teachers" within the meaning of Section 1141(1) and therefore are not "professional employes" within the meaning of Sections 1124 and 1125. In support of this construction, the Board cites the following language from *Brentwood Borough School District Appeal*, 439 Pa. 256, 260, 267 A.2d 848, 850 (1970),:

> Construing sections 1101 and 1141 together, an individual is a teacher for purposes of §1141 if he holds the necessary certificate and devotes at least half his time to teaching or direct educational activities, and he is a professional employe under §1101 if he is a teacher under §1141.

While a reasonable argument can be made that the fifty per cent (50%) test of Section 1141(1) is, as its introductory phrase seems to indicate, only relevant for compensation purposes and not for purposes of determining professional employe status, we need not explore this issue here. For the test, in any event, turns on whether the particular employes devote fifty per cent (50%) or more *"of their time"* to teaching

---

[10] There was a conflict in the testimony with respect to the precise number of hours worked by the part-time employes. In any event, we view the Board's calculation as somewhat of a technicality in view of the uncontradicted testimony that: (1) the part-time teachers taught 5 courses per year (2 courses one semester and 3 courses the next) and full-time teachers taught 10 courses per year; (2) the part-time teachers assumed extracurricular and miscellaneous duties as did their full-time counterparts; and (3) the part-time teachers received exactly one-half the full-time salary for teachers with their education and experience. This clearly suggests to us that these employes were, in fact, precisely "one-half-time" teachers.

or other direct educational activities. The part-time employes in this case devoted *all* of *their* time to teaching and direct educational activities. The Board relies on language in an Opinion of the Secretary of Education[11] to the effect that the test turns on fifty per cent (50%) of the "normal work week."

Such opinions are not, of course, binding on this Court and we reject the reasoning which reads the words "normal work week" into the otherwise clear meaning of the words "their time."[12]

In this case the part-time employes were certificated as teachers, were serving as teachers, and were tenured; they were, therefore, and are professional employes within the meaning of Sections 1101, 1124 and 1125 of the Code and entitled to any and all rights provided therein. We can find no support in the Code for the Board's relegation of tenured part-time employes to a status less than that accorded temporary professional employes and nothing, in fact, that supports a distinction between them and their full-time counterparts.[13] At the same time, fairness and justice dictate that some distinction be drawn between part-time and full-time tenured employes with respect to two factors: (1) the computation of seniority and (2) the elimination of part-time positions.

While there is no reason why a tenured professional employe who, for whatever reason, happens to teach part time should thereby forfeit any seniority rights, it is also manifestly unfair for one year of part-time employment to equal one year of full-time employ-

---

[11] Appeal of Lipperini, Secretary of Education Opinion No. 235 (1974).

[12] Moreover, these part-time employes appear to qualify even under the "normal work week" test. *See supra*, note 10.

[13] The only reference to part-time teachers that we have found in Article XI of the Code appears in Section 1146, 24 P.S. §11-1146 and relates to compensation.

ment for seniority purposes. We are not aware of any provisions in the Code or of any regulation or case dealing with the computation of seniority of a part-time professional employe. We feel it was error, however, in this case, for the Board to allow no credit at all for part-time years of service. In the absence of statutory or regulatory guidelines, the solution that suggests itself is to compute such seniority on a pro rata basis determined by the proportion of full-time duties performed. Thus, the part-time employes in this case, who appear to have performed one-half of full-time duties (*see supra*, note 10), would earn one-half year seniority for each year taught. This case will require a remand for a precise determination of their seniority and a comparison of the result with the seniority of other tenured employes, both part-time and full-time.

A second problem area arises where, as here, a school board eliminates a part-time position, or where one or more part-time positions are consolidated into a full-time position. While school boards should, for economic or other reasons, be free to take such action at any time, they must also respect the seniority rights of tenured employes. As the Supreme Court stated in *Welsko, supra*:

> Seniority rights exist for the dual purpose 'of assuring continuity of service for faithful labor and providing efficient service to the state gained by experience.' (Wesenberg Case, 346 Pa. 438)
>
> Seniority is a matter not to be treated lightly. The very stability of our schools depends on retaining those teachers who because of long years of experience and devotion have earned the obedience of the pupils, the admiration of the parents and the respect of the community.

383 Pa. at 392, 119 A.2d at 44.

We believe the interest of school boards in eliminating part-time positions and the necessity of respecting the seniority rights of tenured part-time employes can be reconciled through the "realignment" process developed in *Welsko, supra,* and discussed above. For just as a teacher with mulitiple certification may be shifted to a different subject area so as to provide a position for another teacher with seniority rights, there is no reason why a tenured part-time teacher with seniority (computed on a pro rata basis as described above), whose position is being eliminated, should not be given the opportunity, in accordance with her seniority rights, to take a full-time position. If such position is not desired, the teacher could then be suspended pursuant to Sections 1124 and 1125 of the Code, subject to reinstatement when and if another part-time position becomes available.

We, therefore, affirm the adjudication of the Board and the order of the court below with respect to the nonrenewal of the contracts of the six temporary professional employes and the suspension of the full-time tenured professional employe.[14] We must, however, reverse the adjudication of the Board and the order of the court below with respect to the suspension of the two part-time tenured professional employes and remand to the court below for a redetermination of their seniority and the rights associated therewith, in a manner consistent with this opinion.

ORDER

Now, January 14, 1977, the order of the Court of Common Pleas of Montgomery County as applicable to temporary professional employes and the full-time

---

[14] The full-time tenured professional employe cannot benefit from any redetermination of the seniority of part-time employes since she was considered, by the Board, as having seniority rights superior to theirs.

tenured professional employe is hereby affirmed. As said order is applicable to part-time tenured professional employes it is hereby reversed and the matter is remanded to said court for further proceedings consistent with this opinion.